and we will move to our second case this morning and that is Dunn v. Jess. All right. There's Ms. Potts. Can you hear me? I can. All right. You may proceed. Okay. Good morning. May it please the court, my name is Abigail Potts. I'm with the Wisconsin Department of Justice and I'm here on behalf of the respondent appellant in this case. The main thing that I would like to focus on this morning in argument is the standard under AEDPA for analyzing ineffective assistance of counsel claims on habeas review. And this may seem basic, but the reason I think it's really important to focus on this today in this case is that we are repeatedly seeing district courts get this wrong. And my hope is that this case will allow the court to once again give a little bit of guidance to lower courts on applying this double level deference in habeas cases, especially in these cases where there is insufficient assistance of counsel. In the case before us, the district court did exactly what the court, the U.S. Supreme Court, said not to do. And what that is, is the district court reviewed the trial attorney's performance de novo, found it deficient under Strickland, and then simply declared that the state court of appeals decision to the contrary was unreasonable. Yeah, I think you're right about that, that the order of battle was incorrect. And we are seeing that more commonly in these 2254 cases. But does that incorrect process that the district court used by addressing the merits and making a decision on testing it against the standard, does that make a material difference here? I think it does, because in the way that the district court and Mr. Dunn both addressed this case is to only go to the record and cite to things that support their conclusion. And that's, that's with respect, I don't think that's quite right. Would you agree, Ms. Potts, that effective assistance in this case required that the trial attorney understand what testimony the medical examiner was going to give on the issue of causation in order to make an informed strategic choice? I think that, that constitutionally sufficient performance in this case did require trial counsel to not be misinformed. I'll take that as a yes. Yes. I think the reason why I'm, or go ahead, I'm sorry, your honor, go ahead. Well, no, if you, if you want to explain the difficulty with my phrasing for you, please explain. Yeah, the reason why I'm being delicate about it is simply because the record here is undisputed at the Machner hearing testimony that the attorney, it was, it was unrefuted that the attorney, by the time he got to trial, understood what the medical examiner was going to say. In terms of all five impacts to the head contributing to the cause of death, right? That and other things. He was not under the illusion that there was an immediacy of death testimony. Well, he was, he was under that impression in all of his pre-trial emails up through the April 20th. Correct. He mentions that you're right in those emails. We're up to just before trial. And he's still thinking that the Emmy is going to give testimony that is on causation. That's very different. Now let's, you're right. He, he says in the Machner hearing, yeah, I understood what to expect. Um, I think it's safe to say if he did not know at trial, if that's incorrect, then that's ineffective. But let's assume that he did know what to expect. And, um, I looked through Dr. Beterzycki's trial testimony, the closing argument, and I'm looking for some attack on the all five impacts contributed to death. And I don't see it. Instead, he reinforces it when he has available to him. I believe an expert who would say, no, it's the fatal blow to the back of the skull. Immediate unconsciousness never wakes up. He's never going to be walking, talking, et cetera. As witnesses testified after Mr. Dunn's slap and Mr. Shuckman's fall. So what is the response to, I don't see any effective response at trial to the medical examiner's testimony that all five impacts contributed to death. Well, that was, that was trial accounts. Counsel's strategy at reiterate that there were multiple, multiple different things. I that's, that's clearly what his strategy was. Okay. But given her testimony, it's undisputed that Mr. Dunn administered a slap to the right side of Mr. Shuckman's head, right? Correct. And there's physical evidence of that impact in the autopsy. Given that undisputed fact, how can he, how can it be effective assistance to repeat and emphasize that all five impacts contributed to death? Well, trial counsel, as he testified at the Mockner hearing was under the, the way that his expert explained the medical examiners, his expert that he consulted outside of trial, explained the medical examiner's report is that there wasn't any obvious autopsy explained harm from the slap. There were different impacts, but, but trial counsel's strategy was to say, look, all we know is that the defendant slapped this guy. We have no idea whether that caused any. He fell, his head bounced on the pavement. That's, that's the, that's Dunn's version, according to the police. Right. And with the autopsy shows an injury to the right side of the victim's head. And in fact, the so-called was it contra Q damage on the other side of the head and no response to the, to the Emmy's testimony that that was that that was contributing to the I'm not seeing it. This is habeas review. And I think it's important to remember, we have to look at the Wisconsin court of appeals decision and they address this. They found that trial counsel reasonably explained his trial tactic approach. And, and it is not our job. My question is whether that is consistent with the record of the, that was before the state court, given this complete absence of any response to the Emmy's about all five impacts to the head contributing to that. Well, I think his approach was to say there were all these impacts and he got this out of the medical examiner at, and I always, I had to phonetically write her name down. Be a risky. He got this out of Dr. Beatrice's testimony at trial that there were multiple different hits, at least three different hits. And trial counsel, and you're saying that, I think, I think what you're trying to say is that they all contributed, correct? That's what she said. Right. But we're arguing this would have been a mere battle of the experts if he had called his own expert, but it was one to nothing on this critical issue of causation at trial. But his own expert agreed with the medical examiner. Back at the time when, back at the time when the attorney thought that we were talking about immediate death from the fracture to the head, right? But we can't, we can't look back at this with hindsight. We have to think about what was thinking at the time of the trial. I'm not trying to look at it with hindsight, Ms. Potts. I'm trying to look at the choice counsel has, assuming he knows at trial, the Emmy is going to say all five impacts contributed to death. And the evidence is clear that my client administered one of those impacts. If that's going to be the evidence at trial, I've got to prepare some response. I think trial counsel testified to the fact that he did not believe that the evidence did not show that the slap actually did cause any of the impacts that contributed to death. And he talked about this at the mock hearing. Based upon what in response, given what the Emmy was saying. Well, the Emmy did not testify expressly that the slap that Don acknowledged he gave the victim was the cause of any of those impacts. There were impacts. Testified repeatedly that every impact to the head contributed to death. And trial counsel strategy was to go into trial saying, look, there was all this confusion around what happened. We have no idea what, whether or not the slap caused one of these contributing impacts. And it definitely didn't cause a significant contribution. And we can argue about that all day if you want to. But I think that really, in some ways, distracts us from the relevant issue on habeas. On habeas, we are not here to second guess trial tactics. We are here to protect constitutional rights here at this broader level and to make sure that the state court did not violate Strickland when it assessed this claim. And I think the state court's decision in this case, very reasonably, looked at the evidence, looked at the Mockner hearing testimony and the unrefuted Mockner hearing testimony and said, look, this guy, this trial attorney, he had a reasonable strategy here. It might not be one that you or I would have done. And I think this is exactly the type of case where double deference on AEDPA is so important because it's so tempting to go in and want to redo this case in our minds. Let me re-ask the question then. How is it a reasonable strategy given the undisputed evidence of Dunn's slap to the side of the head and the fall, given the autopsy evidence of damage from that blow to fail to attack the conclusion that all five impacts to the head contributed to death? Well, I think your question is based a little bit on a premise that I don't think trial counsel would have agreed with, which is it was trial counsel's belief after he talked to his expert that there wasn't explicitly in the autopsy a direct link between a slap and the brain injuries involved. Now, his strategy was to say, look, there were at least three different impacts to this guy's head. My guy only admitted to slapping him. You can't find him guilty. That is not enough to find that that was a significant cause of his death. And that is reasonable when you look at the medical examiners, Dr. Biedrski's testimony, where she could not conclude precisely the significance of each of the smaller impacts. She could conclude that the main cause of death was the skull fracture in the back of the is the immediacy of death. Up until at least April 20th, shortly before trial, trial counsel still believed that the medical examiner was going to testify about the immediacy of death upon the impact to the head. He testifies that at some point before trial started, he realized she was not going to give that critical piece of evidence. But is there anything in the record that we could get closer as to when he learned that she was not going to give that critical piece of evidence that was critical to his defense? Yeah, that's a good question. We don't have a lot in terms of timing of like when he had his aha moment here. What we do have is his examination at trial. It is, I believe, very consistent with his Mochner hearing testimony. He does not go into anything about immediacy of death with the medical examiner. And, you know, she had already done her direct testimony. So maybe he changed his mind during that. But his testimony as prepared and as performed at trial does show that he was focusing on a different strategy. He was focusing on this strategy saying, look, this guy had at least three impacts to his head. You cannot, there is nothing in this record to show that my client caused more than a slap. And that's too big a leap for reasonable doubt. And that was his strategy. But the evidence, I think, would show that trial counsel knew from his own expert, who he had consulted with from the University of Wisconsin, that his expert would testify that death would have been immediate from the impact. Do you agree with that? I wouldn't just based on the Mochner hearing testimony, where trial counsel explained that that was his expert's opinion initially. But by the time he talked to his expert the second time, his expert told him that he agreed, the expert agreed with the medical examiner's report. And he, at least at the Mochner hearing, trial counsel said that that's kind of when he realized that he needed this other approach, that his expert and the medical examiner, neither of them could say with certainty that the skull fracture immediately would cause death. So he, and he didn't feel he needed that. And that I think brings us into a lot of the other issues in this case, where he felt that he, in some ways, the immediacy of death argument undermined Dunn's own testimony. So you think at the Mochner hearing that he, he goes so far as to say that his own expert changed his opinion about the immediacy of death? Yes, I do. You know, I, I know he talks about the difference between his conversations in the first and second. And I mean, I would have to go back and read the language again, specifically. But he, he specifically brings this up, that initially he believed his expert would say immediacy of death. But then by the second time he talks to his expert, his expert is basically saying that the medical examiner is correct. And we don't get a lot of help on it. But isn't that when the council still thinks that, this is the second conversation with Corliss is still in April, and he's before that April 20th email, right? Yeah, you're right. There's an April email. Before he knows what the medical examiner's testimony is going to wind up being. Yeah. Go ahead. Doesn't the vagueness about the timing of his aha moment, as you referred to it, which is looking increasingly likely that it happened during trial, as opposed to an advance of trial, but doesn't that amplify the importance of the late breaking information about the co-defendants experts? Well, I think, and the Wisconsin Court of Appeals didn't address, didn't address that took a very narrow prism on the nature of the claim of ineffectiveness here. But it really was a, a full spectrum claim of a botched no causation defense, which is the late breaking information. Yeah, we don't have exactly a timing on when trial counsel corrected his perception of the medical examiner's testimony. We have his testimony in a Mockner hearing that was unrefuted, that he did know what she was going to testify at that time. And I think that another thing I would just add, just keep in mind as you review the record, is that there were problems with the immediacy of death theory by itself. There were problems with that, that undermined Dunn's testimony, the parking lot gravel in the hair. There were issues, the drag marks, there were issues with that that didn't look good for Dunn. So I think we have to, you know, in hindsight, again, it's so easy to want to go back and retry this better than was the case. So I think that the fact that this decision is sufficiently supported in the record here to withstand habeas review would be our position. All right. Thank you. Yeah. Thank you. Your word check. Did I pronounce that correctly? Your honor, it's pronounced word shock. Thank you. May it please the court. Let's be clear about the facts. What we do know is that 10 days before trial, defense counsel was uninterested in seeing the exculpatory reports of the co-defendants expert in forensic pathology, a report that would have shown that Larry Dunn was not guilty of felony murder because it broke that chain of causation between the slap and fall in the parking lot and the victim's death hours later on the concrete patio behind the building. And the defense counsel did not want to go ahead with the trial. He did not want to delay it. He did not want to shackle himself to the state's expert, a person with whom he had never spoken. Mr. Warchok, counsel testified at the hearing that he believes he did discuss the issue with your client and your client wanted to proceed ahead with trial and didn't want to delay it. How would that factor in and how could it be ineffective if the client is saying, I don't care, I want to go forward? Because defense counsel himself didn't understand the import of that information, that this information would be the only information, expert testimony that would break that chain of causation. And defense counsel testified at the Mockner hearing that he believed that the co-defendants expert's testimony would be superfluous. And his email to the prosecuting attorney, less than an hour after receiving this exculpatory information, he said, our theory has always been that Larry Dunn slapped the victim in self-defense, that he didn't die immediately because people heard him talking, mumbling, grumbling after hitting the parking lot, and that the medical examiner will say he died immediately. Therefore, there had to be a second time that Larry, that the head hit the ground after Larry Dunn slapped. Defense counsel is then asked, well, do you take, is it inconsistent with your theory about what the co-defendants pathologist is going to testify to? And defense counsel says at the Mockner hearing, I didn't believe what the co-defendants expert said mattered because I thought that we could establish any way that there had to be another hit. And I think it's important also to note that same Mockner hearing, defense counsel specifically asked, did you talk to your consulting expert after receiving this exculpatory report? And he said, no, why not? Well, it's in my email response. His email response, again, is our theory has always been that the medical examiner will say that the defendant, I'm sorry, that the victim died immediately from the skull fracture. I think what's important to look at here, obviously, is the Wisconsin Court of Appeals decision. Why did the Wisconsin Court of Appeals find that this strategy was reasonable? A strategy that was based on this quantum of evidence known to defense counsel at the time, but defense counsel never picks up the phone to speak with the state's expert before trial, never calls his own expert in forensic pathology to testify, and doesn't want to wait for the exculpatory reports of the co-defendants expert. The Wisconsin Court of Appeals falls into the same mistake that defense counsel does by suggesting other scenarios that could have caused these injuries. And these other scenarios are that the victim fell on the concrete patio and cracked his skull there because of his acute intoxication, or that the victim was assaulted by the African-American patrons who were offended by the victim's use of a racial slur. That the co-defendant assaulted the victim behind the building. The problem with all of these alternative scenarios is that none of them get Larry Dunn, I'm sorry, get the victim out of the parking lot without having already sustained the skull fracture. And the only way that can be done is through expert testimony saying that the victim would have died within minutes of sustaining that skull fracture because the victim was out in the parking lot for at least 10 to 15 minutes, and then was seen sitting up, was seen semi-coherent and talking, mumbling, grumbling, and was helped to his feet. That that disputes that the skull fracture could have occurred in the parking lot. And the state's, I'm sorry, defense counsel's other theory, and the one that Wisconsin Court of Appeals also mentions, is that Larry Dunn was not responsible for any injury. Now this is just wholly incredible and it's terribly misguided because we've got three immutable facts. One, Larry Dunn admits that he slapped the victim. Two, that the victim fell and hit his head in the parking lot and his head bounced when it hit the parking lot. And three, that the victim died of a skull fracture. These are three immutable facts because Larry Dunn himself either testifies or in his confession to the police, admits to slapping the victim to cause him to fall to the pavement. Admits that his head bounced. Admits that this was a serious injury because the victim was knocked out for 10 to 15 minutes and that he went in to talk to the bartender and said he was concerned about the victim being in the parking lot. So it's simply not credible for defense counsel to argue and adopt this strategy that Larry Dunn's not responsible for any injury. So under those set of circumstances, and what I should add, that defense counsel himself then undermines this any injury strategy in closing argument because he says, well, maybe some of the injuries could have been obscured by the baseball cap that the victim had on in the parking lot. And that's why the bartender may not have seen the injuries at that time. And he also says that the medical examiner said that some of these injuries take a As I understand the case, everything turned on causation. Is that not correct? That's absolutely correct, Your Honor. And I would urge this court not to be blind to what happened in the co-defendant's case. And this court has said that it shouldn't be blind to that is that the prosecution offered to dismiss outright the felony murder charge against the co-defendant. And the co-defendant ends up pleading to misdemeanor battery. But the misdemeanor battery, the exact same misdemeanor battery party to a crime that's charged in Larry Dunn's case is a substantial factor in causing the victim's death. In the co-defendant's case, it's severed. And the reason it's severed is because the co-defendant had the expert reports. The expert reports that broke that chain causation and said that Larry Dunn and the co-defendant were not So, yes. Can I ask you, if you were done with your answer, sire, I didn't mean to interrupt, but the state courts, if I recall correctly, expressed the view that the theory of causation that Mr. Dunn has pursued on at the Mockner hearing and on federal habeas would have contradicted Dunn's own testimony or own account of what happened and that that contributed to counsel. Could you address that, please? Well, the first thing I would say is the jury was never presented with that opportunity. So, I think this court has to look at. No, but a defense counsel can say, look, I've got to make some strategic choices here. I've got my client's version. He's going to testify. And I don't want to undermine what he says. That sounds like a facially plausible reason for a strategic decision. I think it was not, Your Honor. The reason I say that is because the state kind of hammers on this point that the victim was unconscious in the parking lot for 10 to 15 minutes. And that appears to actually contradict our own expert, Dr. Stevens, who testified at the time. The key part of that testimony was that the victim would be rendered unconscious never to regain consciousness. And that's the key point. And that's the point that doesn't matter what Larry Dunn says about the victim's unconsciousness, because the undisputed facts are the victim is conscious before he leaves that parking lot. Do you view this case, Mr. Wierczak, as, in essence, a 2254-D-1 unreasonable application of Strickland, or as an unreasonable treatment of the facts? I believe it's a D-1 situation, unreasonable application of Strickland, Your Honor. There's really no dispute about the facts. And I think one comment that was made is that it certainly seems odd that there's this epiphany that Defense Counsel has shortly before trial, moments before trial, at trial, it doesn't matter. The evidence indicates, I think it's undisputed, that Defense Counsel thought that the state's death was immediate upon the skull fracture. And that information is obviously critical. That Defense Counsel says in the Mockner hearing that this working theory at the time of trial is consistent with showing immediacy of death on the skull fracture. Now, if Defense Counsel suddenly got this 180-degree turn in the consulting expert's understanding of what the autopsy report said, does it make sense that Defense Counsel would have provided this exculpatory information to his consulting expert and asked about that before going into trial? And the record indicates that that final conversation with the consulting expert took place before that email response, before Defense Counsel received that exculpatory report from the co-defendant's experts. So... The Wisconsin Court of Appeals decision focuses exclusively, as I read it, on the failure to call Dr. Porlis, the consultative forensic pathologist for the defendants. There's no sort of, as I indicated earlier in one of my questions, it's a broader attack on the defense attorney's approach to the no causation defense here. It's not just exclusively based on the failure to call Dr. Porlis. We've got much more at play here. Isn't that the thrust of Judge Griesbach's opinion, that this was unreasonable? Because it's not exclusively about not calling Dr. Porlis as a witness. That's exactly right, Your Honor. It's cumulative effect of not speaking with the state's expert before trial, not even picking up the phone to find out what she would say. He still didn't even pick up the phone. If we take this new argument that the state's raising, that Defense Counsel had suddenly changed his mind after consulting with his expert, that the death wouldn't have been immediate. So he didn't even contact the state's expert at that point. Didn't have his own expert waiting to testify on direct examination about the immediacy of death, and couldn't wait for the exculpatory reports from the state's own, I'm sorry, from the co-defendant's experts. In conclusion, I'd just like to say that this court has said that AEDPA's difficult standard does not mean impossible, and the United States Supreme Court has said that the AEDPA's standard of deference does not mean abandonment or abdication of judicial review. The great writ of habeas corpus was developed to protect incarcerated persons from extreme malfunctions in the state criminal justice system. So we would ask this court to affirm the district court's decision, finding that there was an extreme malfunction in Larry Dunn's case in granting the writ of habeas corpus. Thank you. Thank you. With my colleague's indulgence, could I ask, I want to ask both sides this, but I forgot to ask Ms. Potts earlier. What is Mr. Dunn's current status? If this court were to reverse, what would happen to him? His current status, your honor, is somewhat interesting. He's already served the eight years of confinement time for the felony murder charge. He has about a year left on the theft from a person conviction. He is out on bail, released under his own recognizance with the United States parole office providing supervision. And if the state, I'm sorry, if the court were to grant a new trial, print the writ of habeas corpus, then this would go back to the Racine County District Attorney's office for re-indictment, re-prosecution. It's not clear what would happen. Thank you. Thank you. Thank you. Ms. Potts, your time had expired, but you may have one minute for rebuttal. Great. Thank you so much. I think I'll just leave the court with a couple things. One, the statement from Richter that reminds us that even a strong case for relief does not mean the state's contrary conclusion was unreasonable. And I think that's particularly relevant to this case. I would say that I think we're getting to the point where we are starting to second-guess trial tactics for which there was a reasonable explanation in the record. And that is why I see this case as really challenging the application of Strickland to the facts more, at least that's the way I feel it was framed on habeas. And I think that the Wisconsin Court of Appeals applied the correct law, applied it correctly, and that there are facts in the record to support it. And that habeas relief is simply not warranted here. So thank you for your time. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement.